Good morning, everyone, and welcome. We have six cases on this morning's argument calendar. We'll begin with Appeal No. 22-1607, Lorrie Meier v. Pacific Life Insurance Company. Mr. Garvino. Good morning, Your Honors. Good morning. On behalf of the appellant, Lorrie Meier, may it please the Court, this is a life insurance rescission case decided adversely to the policy beneficiary, Lorrie Meier, by way of a summary judgment ruling that is the subject of this appeal. I will refer to Appellee as Pacific Life or PLIC, if I may. To be sure, if Ron Meier made a misrepresentation about cancer when he signed his Pacific Life insurance application, Lorrie should lose this case, but those are not the facts here. Here the Pacific Life insurance application has no health questions, such as, have you ever been diagnosed with cancer? Here Ron had not been diagnosed with cancer when he signed the application on July 26, 2018. As a result, Your Honors, this case deals primarily with the duty issue rather than the issue of is cancer a serious medical condition. Did Ron have a duty to disclose his post-application diagnosis in the first place, since the Pacific Life application has no health questions, and since his cancer had not been diagnosed when he signed the application? To be sure, no one disputes that cancer is a serious medical condition. After all, that's what Lorrie's husband, Ron, died from. Are you disputing that the insurance company actually reviewed and relied on the medical supplement? That seemed to be uncontested. We don't know, Your Honor, obviously, what was done internally. They contend that they did. We think that that was not sent to the company by the applicant. The district court acknowledged that there's evidence that it wasn't sent to the district, I'm sorry, to the insurance company by the applicant. The district court determined that that didn't matter. We contend that it did. We think it found a way to- Is there anything in the summary judgment briefing statement of facts that disputes the particular fact that they actually saw and relied on the medical supplement? I don't believe- I understand your argument. It's not part of it. It doesn't matter. But take one step back. I didn't see anything disputing that fact in the record. I think you're correct, Your Honor. I think they did. Our contention is that they weren't required to, and therefore, it wasn't material. But I think it appears that they got it, and they read it, and they may have relied on it in their decision. Mr. Reno, let me make sure- I want to ask a related question, and it may be the exact same question. If it is, you can tell me that. In the application in that medical certification section where there's a reference, there's a box check that the proposed insured is attaching an examination from Lincoln Financial, and then it's dated May 3rd. Do we know what was attached? Your Honor, we do not, because- Is that the same question in your view, or is that a different question? I think it's a related question, but Pacific Life filed what they contended. Of course, the insurer doesn't know. They didn't issue the policy, so typically in these, as you know, the insurance company will say, here's the complete policy, whatever- It just looks like that. The way that that form is filled out, if either of us were to fill it out, it looks like something is attached. The question I have is, what's that something called? Is it a medical supplement? Is it an examiner's report? Is it one of these other terms that's thrown around in here? Your Honor, we contend that what it was referring to, whether it was physically attached to the application when it was received, all this was done apparently by electronic transmission. Yeah, or emailed, or however it was sent in. We contend that it was this examiner's report that's in the record. It's filed at document 21-2, I apologize, 6420, again, document 21-2, and it actually states at the end, it says, I certified, I made this examination, so it refers to itself as an examination. It's also titled examiner's report, and it refers internally to this exam, so we believe that it's either clear that the exam was what was attached, or if the application is ambiguous on that point, that that ambiguity should redound in favor of the applicant, just as in the Karajanis case, where the court required the insurance company to be clear about what was part of the application, so that the applicant would understand what could be used for a rescission later. It's a fairness question, is that the Seventh Circuit ruled in the Karajanis case. But the, I mean, let me just close the loop on this if I can. There was discovery that occurred, right? It's a summary judgment appeal. Yes. Okay, in the course of that summary judgment, did you all exchange paperwork that shed some light on whether it was sent in electronically, or just through some other kind of e-submission, what it was that was attached? Well. Because if it seemed like that, it's discoverable. I mean, if the insurance company received the application, it should know what it received. Right, and I do, I'm going from memory, Your Honor, but I believe that there's no dispute that the examiner's report was received by Pacific Life, and was considered by them. What Pacific Life did in their counterclaim, and then we clarified in our answer, is they actually alleged that the exam referred to on the application was the medical supplement, which is a two-page document, found in the record at 21-2 pages, the first two pages of that. They contended, and what they did with their counterclaim, is they attached both of these the medical supplement, and they're dated, incidentally, I'm sorry, their pages say pages 1 of 2 and 2 of 2, so it's clear that the medical supplement is a stand-alone document. They attached this, and then they attached the two-page examiner report. They aggregated those and called those the examination, and we denied that in our answer to the counterclaim, and we said, it's disputed. And we contend that the examination is the second two of the four pages, and we disputed that the supplement was attached to the application. So that's a dispute that should be clear in the record. Those are the two documents, though, that were completed at the same time. The same nurse conducted the examination. Mr. Meyer signed them. The nurse signed them. They all, it all happened at the same time, the same place, correct? That's correct, Your Honor. Three months earlier for Lincoln Financial, who may, in fact, have required both documents. That's correct. So my related question is, I've tried to figure that out. I can't figure it out. I mean, you've been helpful on it, but why does it matter? Why does it make any difference whatsoever? And the reason I'm asking that is in light of the representations that were made upon delivery of the report, and the representation in particular in paragraph one. Are you referring, Your Honor, to the policy delivery? The policy delivery. Right, exactly. We're, right. So, Your Honor, we contend that that is a very important distinction, because the policy delivery receipt does not have the applicant reaffirm the health of the applicant. It's a much more narrow reaffirmation. It says under paragraph one, the second bullet point, it says, all answers in the application are still true and complete. So that begs the question, what is the application? Exactly. If the application. What is the application? If the application does not include, does not clearly include the supplement, or if it's ambiguous, then the policy delivery receipt, even if it was signed, and even if it was part of the contract, does not necessarily reaffirm the health questions that are only on the medical supplement. That's the problem. And that's the vagueness and ambiguity that we raised and said this does not make it clear to the applicant what was part of the application. And that very question was what animated, I believe, is what animated the Seventh Circuit in Karygiannis to say, if you're going to take the extraordinary step of rescinding a life insurance application, you must be clear to the applicant. This is what's required, and this is when it has to be disclosed, and if you're not, since you prepare those documents, any uncertainty in that should redound against the insurance company, not the applicant, who is not an expert in these matters. Do you think that that paragraph one in the policy delivery report, or the policy delivery receipt, needs to be read vis-a-vis declaration number six? In other words, I see a linkage between the two. Do you think, no, no, no, that's not correct. You shouldn't see any link between the two. Your Honor, we wrestled with that issue and tried to cast a little light on that in the brief, and that is, they certainly could be read if the, depending on, you know, if this was signed. But let's assume for the sake of argument it was signed and the court decides it's enforceable. There's no question that we juxtaposed the language in the policy delivery receipt with the state declaration six in the application that says to the applicant, your answers must be true no later than the date the application was signed. Not thereafter. No later than. That sounds like a deadline. That's the second part of declaration six. That's correct. The first sentence, talking about the medical information, doesn't have that limitation attached to the language. So we would have to read it that the limitation in the second sentence applies to the first sentence as well. That's correct. And we think that it was intended only in that way, otherwise there's no, there's, otherwise the, I mean, the first part of that declaration talks about the health of the insured. It's just sort of an introductory sentence we contend. And when read as a whole, it's saying you have to notify us of changes in health and then it refers to the specific documents. If anything changes on those, you must, we must be notified no later than. That's a life insurance policy. You say the first sentence is just an introductory part. It seems a bit of a stretch when we're talking about a life insurance policy that introductory language or the first sentence specifically mentioning changes in the health of the proposed insurer would just be introductory and not specific.  I understand, Your Honor. But if we read that alone, if we read that, if we were to read that as just a stand-alone provision, then it's really further unclear if it's not informed by the remaining language because it says I must inform the producer or PLIC of writing in any changes in the health of any proposed insurer. Two problems with that, if it's not tethered to the subsequent language dealing with applications in medical forms. So it says I must inform the producer of any changes. There's no baseline, changes from. I think there is. I understand your argument there. Let me, you're going to disagree, but what I'm more interested in is why you disagree. But here's what, here's how I think you could try to reconcile that. You could say before the policy is delivered and before this here policy delivery receipt is executed, the status of this endeavor is one where it's in an application stage. It's application stage all the way through and then you hit policy delivery and then the policy, it's delivered, this document's executed, everything is in effect. And that seems to follow from the terms of the declaration. So it can't be the case, I don't think, that when Declaration 6 talks about changes in health, that it's referring to an empty set. In other words, that the insurance company is saying we want you to inform us of changes in health, but that circumstance is never ever going to arise.  It's going to arise in a situation where health changes after the date that the would-be insured fills out the application, but before the policy is delivered and therefore before it becomes effective. That's the window in time in which one's health could change. So Your Honor, if I may address that. So reading all these documents very carefully, one remembers that this is not a policy by our contention that has no underwriting. We believe that the district court perhaps thought that we were arguing that this is a guarantee issue policy, no underwriting whatsoever, but if you look at those internal rules that we provided to you that I can't speak more particularly to, those internal rules talk about when certain documents are required and certain documents are not required. And with respect to the examiner's report, there's no question this application referred to the examiner's report. We believe it was part of this and it was considered by the insurance company. That examiner's report contains a host of information, blood tests, urine tests, height, weight, respiration rate, blood pressure, things of that nature. So this is, we contend that this was simply an underwriting, a streamlined underwriting to facilitate policies under a certain dollar amount, if you're under a certain age, you have this limited underwriting, you have an examiner's report. Okay, fine. So what's the, give me the hypothetical then of when health would change within the meaning of Declaration 6 such that an insured would have to, would be insured, would have to update the insurance company. Thank you. What's that hypothetical? Thank you, Judge. And that is based on this because the application also contemplates that the applicants can submit a, an exam up to six months old. And I think that's what it's referring to in fairness. You get to submit it, that's under, that's on page four, your honors, if you look at page four and it looks like my time is up. Well, I want to have a question for you. Mr. Gravino, I want to see if you could help me with the definition of application as used in the policy. And specifically, my concern is whether or not the medical supplement would fall under  that definition. Of course, that's the position of Pacific Life, but isn't that pretty much covers the medical supplement? Your Honor, and this is where I think those internal rules are very helpful. I have to be very careful what I say because they're under seal. So I'll try to answer your question as best I can with that. The rules that you have before you in the chart make it very clear that certain information is not required if another document, a recent version of another document is submitted. It's very clear in the rules, it actually has a no. It says certain information and under it, it says no. If the other information that's submitted is recent, meaning within a certain number of months. So the hypothetical that was posited, someone submits a two or three or four or five or six month old document that I'll refer to obliquely if I may, where they had some things checked and then they don't make application with Pacific Life for several months. I believe that that's a rational and fair way to read Declaration 6 that says you must inform them of changes in health. If anything changes and then it refers to medical forms, then you have to update them when you sign the Pacific Life application, you know, three or four or five or six months hence. So you give them this first document that has a lot of health information, they get blood tests and samples. If your health changed between that examination and when you sign this application, then and there you have to tell them that and that's consistent with that sippage case and the other cases we cited. This is a contract matter where the court said, you know, when the insurance company requires you to affirm the information as accurate, that's a matter of contract law and if the application... So if he had been diagnosed with cancer the day before he signed his application and the application only had that exam attached to it, not the medical supplement, would he have been required to inform them? And if so, why? Under your argument. Potentially, depending on how that diagnosis might have impacted the accuracy of the information in the examination. So if he had been diagnosed with the terminal cancer the day before he signed it, you think there's an argument that because the exam doesn't mention cancer on it, that he would not have had to disclose that diagnosis? Again I think it depends on if the cancer might have impacted any of his... Well would it have? I think that would depend on what he was told by his doctors. Did he have blood tests that revealed the cancer? Because this had blood work done. So if there's a potential that it could have impacted what was on the exam, why would it He learned of that after he signed, but before the policy was issued. Why wouldn't he have been required to update it under Declaration 6? Your Honor, only because of the language in Declaration 6. And just to be clear in our position, we're not saying this as a model of clarity. We're saying that it seems to say what it says, and that is that you must update Pacific Wildlife no later than the date the application is signed, and that from the eyes of an average applicant who's not schooled in how an insurance company might interpret these various phrases in fairness, and again it's primarily based on the Karajanis ruling that actually granted summary judgment on the pleadings for the insured in that case, because the court was Your Honor, I'm way past my time, so I'll just make this final comment if I may. In Karajanis, it was very interesting because the court took the insurance company's position as true, that the applicant was a smoker, that the applicant lied on the smoking statement that said he was a non-smoker, that he applied for a non-smoker policy, and the Seventh Circuit actually said that it accepted as true that that was a material misrepresentation and national fidelity would not have issued that policy had it known he was a smoker. But they were so concerned about the fairness of telling applicants what is part of the application that they said it wasn't clear that this smoking statement was part of the application, and based on that uncertainty, they ruled on the pleadings for the insured, no discovery, et cetera. So we contend at the end of the day that this application either clearly says what it says, that you have to notify Pacific Life no later than the date of the application, or at a minimum, it's ambiguous and it should be construed in the insured state. Okay, very well, Mr. Guarino. Let's hear from Mr. O'Malley. Thank you, Your Honor. May I ask, I used up all my time. No, we used a lot of it for you by asking you a lot of questions, so we'll give you a couple minutes on rebuttal. Thank you so much. You're welcome. Good morning, and may it please the Court. My name is Mike O'Malley and I represent Appellant Pacific Life Insurance Company in this case. As Your Honors is aware, at its essence, this case involves a very simple question. Was an applicant for a life insurance policy obligated to disclose a stage four cancer diagnosis prior to the inception of that policy? The answer, quite predictably, is yes, of course. Plaintiff attempts to hack the application to pieces and manufacture ambiguity to support the untenable position that a stage four cancer diagnosis is either not required to be disclosed or otherwise is immaterial to the underwriting of a life insurance policy. The district court rejected these arguments and Pacific Life encourages this court to do the same. Rather, this court should look at the plain language in the application, the simple facts of this case, and simply apply common sense. Mr. O'Malley, before we go too far down that road, you aren't arguing that there's any evidence of intent to deceive or bad faith here, are you? Not on appeal, Your Honor. There was, in the underlying action, a cause for fraud, but that's not subject on appeal. There are numerous errors in plaintiff's briefs, but in sum, there are five reasons why this court should affirm the district court ruling. First, the district court correctly held that the medical supplement was, in fact, a part of the application, at least from the time that Mr. Meyer executed the policy delivery receipt and amended the application after his cancer diagnosis. Indeed, as Your Honors were referring to before, the policy specifically defines the word application to include supplements. The medical supplement is obviously a supplement. Additionally, on the very top of that medical supplement, it specifically says that it's a part of the application. Furthermore, Ms. Craig, the underwriter, confirmed during her deposition testimony repeatedly that she considered that medical supplement to be part of the application and confirmed multiple times the policy would never have been issued had that medical supplement not been provided. She confirmed also that the medical supplement had, in fact- Was that contested at all? I did not see any fact disputing that in the summary judgment briefing or 56-1s. Correct, Your Honor. There's no fact disputing that Mr. Meyer provided that information. He actually also provided a HIPAA form confirming that they were able to disclose and share that with Pacific Life. And the underwriter confirmed that in her deposition testimony. And was there- Just a follow-up. Was there anything disputing that she reviewed the medical supplement and relied on it? No, Your Honor. Okay, so however the medical supplement may have gotten to Pacific Life, we know as a matter of uncontested fact it got there. Absolutely, Your Honor. And it was considered as part of the processing of the application. Yes, you're correct, Your Honor. And that is repeatedly confirmed in her deposition testimony. And essentially plaintiff's argument in response to this is that the application doesn't say the word supplement and therefore it's not part of the application. But as we just discussed, the underwriter confirmed that that was considered part of the application. The definition of application includes supplement and the supplement itself says that it is part of the application. Mr. O'Malley, what's the best way to read that language that we were having a discussion with Mr. Garvino about at the tail end of Declaration 6? Indeed. Well, I think Your Honor's had it exactly right. That it makes sense if the understanding is that you are required to continue to update material changes to your health following the initial signature of that application. And that is why after the delivery receipt and the Paul Edney amendment is considered- were the same at the time that he executed the policy delivery receipt as well as the amendment, so that language does make sense contemplating that health changes could change or could occur following the initial application and prior to the policy incepting. Okay. In fairness to Mr. Garvino's argument, the language is a little odd at the end, right? If you're obligated to notify the insurance company of changes no later than at the application- the time the application is signed, the signing and submission of the application seemed to me to occur at the very beginning, right? So it's very odd to have to notify an insurance company of something that's changed before I even have applied, right? I don't even- I haven't even made a representation to them. So there's no baseline against which I'm going to have to, you know, tell them that something has changed. I think there are two answers to that question. First, warranty number one specifically says that it will continue to be amended until such time that the amendment is executed and that kind of speaks to that issue. Would you say warranty number one? Warranty- or declaration number one, exactly, on the application, right? Same list of declarations. Exactly, exactly. And the other aspect of this is that that also makes sense if we take the understanding that the medical supplement is in fact part of the application because the medical supplement occurred prior to the execution of that application. So if there were changes in that health history and in that medical supplement, at that point that's when you're required to disclose it. You're also required to disclose it following the initial application and prior to the inception of the policy. So if we reject plaintiffs- And what are you relying on for that? The first part of Declaration 6? For which aspect? For your second statement that you're required to update it between your submission of the signed application and the execution of the policy. I think there are four occasions in which that's the case. But your statement, you were talking about Declaration 6. I wasn't sure if you were- Exactly. That's the first sentence in Declaration 6. But there are independent bases and additional- The words prior to delivery of the policy. That's the answer to that question, right? That the operative language that requires the update is the prior to delivery of the policy language. Exactly, Your Honor. Exactly. And to address the other points, there are additional and independent bases and occasions in which the applicant was specifically instructed that he was required to provide updates to his health history prior to the inception of the policy. We already talked about warranty number one, or warranty number six, rather, in that first sentence that specifically says that he was obligated to inform the producer of Pacific Life Insurance Company in writing of any changes in health of any proposed insureds. Additionally, warranty number four specifically said that coverage will take effect when the policy is delivered, the premium is paid, and only if at that time each proposed insured is alive and all answers in this application that are material to the risk are still true and complete. Additionally, the policy delivery receipt, again, required him to confirm that all of his answers in the application has helped remain the same. Additionally, he executed the amendments, which also required him to confirm and stated, by signing below, you agree that he amends the application and agrees that all representations made in the form are true and complete. There are four instances in which Pacific Life specifically instructed the applicant to inform Pacific Life of any material changes to his health prior to the inception of the policy. He failed to do that, and that constitutes a misrepresentation, warranting rescission of this case. Additionally, your honors didn't really address this in the opening, but Plankett argues that it did, in fact, provide notice of the change in health to the producer, but this sort of begs the question, why would, if the applicant did not believe that he was required to provide that information, why is he also arguing that he did provide that information orally? That argument really has no merit, because in any event, he was required to provide that information in writing. There's no evidence at all, and Plankett does not appear to dispute that notification was not provided in writing. Also, Plankett argues that there's a question as to whether the signature on the policy delivery receipt is valid, so there might be an argument that it was forged. This argument does not make any sense, because if he did not sign that policy delivery receipt, then the policy would never have incepted. And then, the final point is, obviously, there can be no bad faith here, because there's a good faith reason to deny, at least, at a minimum, a bona fide dispute, given the fact that the district court found that summary judgment was warranted. So, for all these reasons, we ask the court to affirm the district court's ruling. Okay. Very well. Thank you, Mr. O'Malley. Mr. Covino, I'll give you two minutes for rebuttal. Thank you, Your Honor. You're welcome. Mr. Covino, on the signature, you aren't disputing that it was signed on his behalf, are you? I understand you're disputing it may not have been Mr. Meyer's signature, but are you disputing it was signed on his behalf? We do, Your Honor. We put evidence in the record that the agents at the agency, the representatives there, they admitted under oath that they sometimes sign names to get things done. That was a quote out of a deposition. We took a deposition of one of the personnel. We also put evidence in the record from that deposition that they don't receive their commission, which was about $7,000 or so on the policy until the policy delivery receipt gets sent to the carrier. So, we believe there's a reasonable inference. Lori attested that she was married for almost 40 years, represented, I'm sorry, recognized her husband's signature and didn't believe it was on that document. That was his signature. We put the evidence in about the agency. And so, there's a reasonable inference that, and someone, it was also very unclear how they got it. It wasn't mailed. I think it was electronically sent. There's an inference that somebody signs his name to get the- The part that really confuses me about this, though, is your client wants the insurance. So, when the argument is the signature is forged, I don't know how you, I get really confused about that because I think, hold on, hold on. Mrs. Meyer wants the life insurance. She doesn't not want it. So, that means there has to be a policy. And when you argue that all this has been forged, that the books have been cooked here, that sounds like an argument against interest. We made the distinction, Your Honor, the district court found that if the policy wasn't delivered or if the policy receipt wasn't signed, then there was a, it never accepted. But the application actually says the policy has to be delivered. And there was never a dispute that the policy was received by the Meyers. They paid premiums for it. That was not an issue. What was at issue was whether the receipt was- But isn't that incorporated into the policy? I don't think that argument gets you very far. Well, the policy delivery receipt was, there was, the record is, you know, very unclear as to how they got it. Again, I think it was electronic. But it seems like you can't, based on the language in the policy, you can't have a policy if you don't have the policy receipt signed. It actually says delivered, Your Honor, and Pacific Life never challenged that it was delivered. It was mailed. The application may say that, but I don't think the policy itself says that. And I don't, we've used up your time. So, I don't want to send you looking for documents. Thank you, Your Honor. Any concluding comment? I guess my concluding comment, Your Honors, is that, you know, Pacific Life prepared this application. And again, we are not suggesting that this is a model of clarity. To the contrary, we're suggesting to the average applicant the language in it would not convey to that applicant that they're required to update the information after it was signed. That's based on the language in Declaration 6. And just this last comment, counsel made the statement reading Declaration 6 with respect to the first part, the quote, after the, you have to update, as to your health, after the initial signature. That language is not in Declaration 6. So, that's the problem. It certainly could have been, but it's not. And then lastly, Your Honors, in the declaration, I believe you asked, Judge, about this prior to the delivery of policy language, that odd language in Declaration 6. And it's interesting, because that language actually appears. I apologize. No, no problem. We, I think we understand the part. We understand everybody's position on this. It appears in the second part. Okay. Not the first part. So, we believe that the language at the end of the second part that says no later than the policy delivery receipt really trumps that. So, thank you. Okay. Very well. Thanks to both parties. We'll take the case under advisement.